**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 13, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DENICE TWIGG,

      Plaintiff - Appellant,

v.

HAWKER BEECHCRAFT
CORPORATION,

      Defendant - Appellee.

No. 10-3118

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 08-CV-2632-JTM)**

Alan V. Johnson, Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., Topeka, Kansas, for Plaintiff-Appellant.

Terry L. Mann, Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., Wichita, Kansas, for Defendant-Appellee.

Before **BRISCOE**, Chief Judge, **EBEL**, and **TYMKOVICH**, Circuit Judges.

**EBEL**, Circuit Judge.

Plaintiff-Appellant Denice Twigg appeals from the district court's order granting summary judgment in favor of Defendant-Appellee Hawker Beechcraft Corporation ("HBC") on Twigg's claims for (1) retaliation under 42 U.S.C. § 1981; (2) retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–54; and (3) interference under the FMLA. Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that Twigg failed to produce sufficient evidence that HBC terminated her employment in retaliation for her complaints about race discrimination or her taking FMLA leave. Therefore, her retaliation claims under § 1981 and the FMLA fail as a matter of law. We further conclude that the district court properly granted summary judgment to HBC on Twigg's FMLA interference claim because HBC met its burden of demonstrating that it terminated Twigg for a reason unrelated to her FMLA leave— namely, her failure to comply with the company's notice-of-absence policy. Accordingly, we AFFIRM the judgment of the district court.

## I.     BACKGROUND

### A.     Twigg's Position with HBC

HBC, formerly known as Raytheon Aircraft Company, is a manufacturer of civilian and military aircrafts. Twigg was employed by HBC from April 2, 1997, to April 7, 2008. At all times relevant to the present action, Twigg worked in HBC's Technical Manual Distribution Center ("TMDC") as a Media Production Specialist. Her duties included converting aircraft document files and manuals into .pdf electronic files for compact-disc and web delivery, answering customer questions concerning navigation of

2

HBC's website, and keeping certain information on the website up to date. Cindy Ealey was Twigg's immediate supervisor. Ealey, in turn, was supervised by Kathy Sade, who was classified as a manager. Sade indirectly supervised Twigg.

## B.     Twigg's Complaints About Race Discrimination

During part of Twigg's employment with HBC, Teresa Cole, an African American, was one of Twigg's coworkers in the TMDC. Cole was supervised by Sharon Schlegel, who reported directly to Sade. In the spring of 2007, Twigg complained to Ealey that Schlegel was treating Cole unfairly because of Cole's race. Twigg observed Schlegel demeaning Cole and "overheard conversations in regard to blacks are lazy." (Aplt. App. at 190.) Twigg also felt that Cole was being forced to work extra hours to make up for time that she had taken off in order to attend physical therapy for a hand injury sustained at work. In late 2007 or January 2008, Twigg again complained to Ealey about the treatment of Cole, this time expressing her belief that Schlegel was unfairly denying Cole time off work. Although Ealey had no supervisory authority over Cole or Schlegel, Ealey relayed Twigg's complaints to Sade.

## C.     Twigg's FMLA Leaves

### 1.     HBC's FMLA Policy and Rules of Conduct

HBC distributes and makes available to all of its employees a short FMLA brochure. This brochure was mailed to every employee's home in August 2006. In addition, employees could get a copy of the brochure from Human Resources ("HR") personnel, in the medical department, or on the company intranet. The brochure provides

3

an overview of the FMLA and explains how employees may request family leave. The brochure also contains a section entitled "Employee Responsibilities," which states, in pertinent part, "Until you receive <u>formal notification</u> that your family leave has been approved, you must properly report your absence to your department every day. Proper reporting is defined as reporting prior to the beginning of your shift." (Aple. Supp. App. at 85 (emphasis added).)

When Twigg participated in new-employee orientation in 1996, she was provided with a copy of HBC's attendance policy and Rules of Conduct. Rule 1 of HBC's Rules for Personal Conduct states that it is a violation of company policy for an employee to be "[a]bsen[t] for three consecutive working days without proper notification." (<u>Id.</u> at 77.) The presumptive discipline for a first-time violator of this rule is termination.

### 2. 2004 FMLA Leave

In 2004, Twigg applied for FMLA leave so that she could have elective cosmetic surgery. HBC approved her for six weeks of FMLA leave. When Twigg returned after her leave, she did not experience any retaliation or hear anybody say anything critical about the fact that she took FMLA leave.

### 3. 2008 FMLA Leave

On February 19, 2008, Twigg submitted a written request for FMLA leave to HBC's HR department. She asked for leave beginning the next day, February 20, 2008, and continuing through April 17, 2008. The reason listed for the leave was "[s]urgery on Feb 20th, [p]er Dr. possible 6–8 wk required recovery." (Aple. Supp. App. at 152.)

4

Twigg claims that at some point before her surgery, both Ealey and Sade approved her absence from work until April 18, 2008. She also claims that Ealey approved the following out-of-office auto reply message that Twigg posted on her e-mail account during her absence: "I will be out of the office until approximately April 18, 2008." (Aplt. App. at 187.)

Along with her FMLA request, Twigg submitted a "Certification of Health Care Provider" as required by HBC policy. (Id. at 146–47.) This form was filled out and signed by Dr. Joseph Lickteig. Dr. Lickteig identified Twigg's diagnosis as "bunion right foot" and stated that the probable duration of the condition was three months. (Id. at 146.) In response to Question 7 on the form, which asked the doctor to describe the medical facts supporting the existence of a "serious health condition," Dr. Lickteig wrote, "Surgery to correct bunion with post-op recovery necessary i.e. non-wt. bearing etc." (Id.) Question 12(a) on the form asked, "If medical leave is required for the employee's absence from work because of the employee's own condition[,] . . . is the employee unable to perform work of any kind?" (Id. at 147.) Dr. Lickteig responded, "Can preform [sic] only non-wt. bearing work." (Id.) A follow-up question, Question 12(b), inquired, "If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job? If yes, please list the essential functions the employee is unable to perform." (Id.) Dr. Lickteig did not answer this question.

5

### a) HBC's Initial Approval of Twigg's Leave Request Through February 29, 2008

On February 21, 2008, Amber Cotton, an assistant in HBC's HR department who helped with FMLA administration, prepared a memorandum addressing Twigg's FMLA request. The memorandum stated, "Your request for FMLA leave has been reviewed and approved for the following dates: February 20–29, 2008." (Aplt. App. at 148.) Cotton testified in her deposition that she sent this memorandum to Twigg's home address via regular U.S. mail, but Twigg claims that she never received a copy of the memorandum. Twigg testified, however, that she called Cindy Ealey on February 25, 2008, to provide an update on her surgery and was informed that her FMLA leave had only been approved through February 29.

Nita Long, HBC's former director of compensation and benefits and the individual in charge of HBC's FMLA program in 2008, was responsible for the decision to approve Twigg's FMLA leave for one week. Both Long and Cotton acknowledged that Dr. Lickteig's certification did not indicate the length of time that Twigg would need to be off work. Long testified that if Dr. Lickteig had provided a specific time frame, HBC would have been bound by the certification unless the company followed the procedures in the Code of Federal Regulations for seeking a second medical opinion. Because the doctor did not specify a time frame, however, Long made the decision based on her own prior experience with bunion surgery and the doctor's indication that Twigg could perform non-weight-bearing work. Long thought that the surgery and healing should

6

take roughly one week and that the company could thereafter accommodate the restriction that Twigg not perform weight-bearing work.[1]

Both Long and Cotton were questioned about whether they viewed Dr. Lickteig's certification as incomplete or inadequate because of the doctor's failure to provide a time frame that Twigg would need to be off work. Long responded that she did not view the certification as incomplete or inadequate since it contained the notation indicating that Twigg could perform only non-weight-bearing work, which Long interpreted to mean that Twigg "should be able to work as long as we [were] able to keep [her] off [her] feet." (Aple. Supp. App. at 55.) Similarly, Cotton explained that it was her understanding that "[i]ncomplete or inadequate medical certification would mean you are unable to make a decision based on information you have," which she did not believe to be the case with respect to Dr. Lickteig's certification. (Aplt. App. at 212.)

Cotton also testified that when HBC finds a medical certification insufficient or in need of clarification, the company sends a notification to the employee highlighting any deficiencies and requesting additional documentation. HBC never notified Twigg that Dr. Lickteig's certification was incomplete or insufficient. Instead, because Long did not view the certification as inadequate, she approved Twigg's FMLA request for the time

---

[1] Long did not specify what non-weight-bearing functions Twigg could perform, but Twigg testified that her job primarily involved working at a desk and that she could avoid most of the walking necessitated by her job through the use of telephone and e-mail.

7

she thought necessary and expected that Twigg would provide additional information if she disagreed with Long's decision.

### b) Twigg's Application for Short-Term Disability Benefits

HBC offers its employees short-term disability benefits covering seventy-five percent of their income for up to twelve weeks when they cannot work as a result of a disability. Employees have the option of purchasing supplemental benefits to cover the remaining twenty-five percent of their wages. In 2004, Twigg purchased additional short-term disability benefits through Metropolitan Life Insurance Company ("MetLife"). When Twigg applied for FMLA leave for her bunion surgery in 2008, she also separately applied for the supplemental short-term disability benefits from MetLife. If an employee who has applied for FMLA leave is approved for short-term disability benefits by MetLife, HBC's practice is to approve FMLA leave for the same period of time that MetLife has approved short-term disability benefits. Long explained that the reason for this practice is that MetLife receives more detailed medical information from an employee's physician than does HBC. Furthermore, according to Long, "MetLife was always very, very strict in how they made their determinations. So if they approved a period of time for an employee to be off on short-term disability, then it was my belief it must be legit and, therefore, we would comply with anything that [MetLife] decided." (Aple. Supp. App. at 57.)

### c) HBC's Approval of Twigg's Leave Request Through April 1, 2008

On February 26, 2008, Twigg contacted Cotton to figure out why her FMLA leave had only been approved through February 29. Cotton told Twigg that Twigg needed to call MetLife to determine why MetLife had only approved her short-term disability benefits for one week. In her affidavit, Twigg claims that Cotton also explained that the procedure for applying for FMLA leave is different from the procedure for obtaining short-term disability benefits; however, Cotton did not advise Twigg of HBC's practice of approving FMLA leave for as long as MetLife approves short-term disability benefits. Immediately after her conversation with Cotton, Twigg called MetLife and spoke to a customer service representative who informed Twigg that MetLife was still waiting on documents from her doctor.

On February 28, 2008, Dr. Lickteig faxed additional medical information to MetLife. In response to a question asking for Twigg's anticipated return-to-work date, Dr. Lickteig answered, "4-21-08." (Aplt. App. at 218.) Later in the questionnaire, Dr. Lickteig also noted, "Pt. isn't ready to return to work yet." (Id. at 218A.) Nothing in the record suggests that HBC saw this information before the discovery phase of the present lawsuit.

On March 4, 2008, Twigg called Cotton regarding MetLife and her short-term disability benefits. Twigg claims that during this conversation, Cotton told her that "everything was taken care of; that [she] shouldn't be concerned about [her] FMLA leave; and that Ms. Cotton would call [her] if there was a problem." (Aplt. App. at 187.) Twigg does not assert, however, that any dates were mentioned during this conversation.

9

On March 14, 2008, MetLife sent Cotton an e-mail indicating that it had approved short-term disability benefits for Twigg through April 1, 2008. That same day, Cotton prepared a memorandum to Twigg that stated, "Your request for FMLA leave has been reviewed and approved for the following dates: February 20, 2008 thru April 1, 2008 ([short-term disability] approved thru 4/1)." (Aple. Supp. App. at 163.) Cotton testified that she mailed the memorandum to Twigg's home address, though, as with the prior memorandum approving Twigg's leave through February 29, 2008, Twigg claims that she never received this memorandum.

During the period between February 29, 2008 (the expiration date of Twigg's original FMLA leave approval), and March 14, 2008 (the date on which Twigg's approval was extended through April 1, 2008), Twigg's status with HBC was "FMLA pending," which meant that she had not been formally approved for FMLA leave and "had nothing covering her absences." (Aplt. App. at 214.) Nevertheless, Kathy Sade did not contemplate taking any disciplinary action against Twigg during that time because she "thought the paperwork just needed to catch up." (Id. at 205.)

On March 18, 2008, Twigg sent an e-mail to Ealey, Sade, and other members of her department. (Id. at 232–33.) This e-mail provided a general update on Twigg's status and concluded, "Take care all, I will see you in about a month." (Id. at 233.)

Twigg testified that she never received any notification from HBC that her leave had been approved through the date that she originally requested, April 17, 2008. (Aple. Supp. App. at 46 (Question: "Had you ever received anything from the company saying

10

you were approved for FMLA leave through the 17th of April?" Twigg: "No.").) Yet other than the March 4 telephone conversation with Cotton and the March 18 e-mail, Twigg made no attempt to contact anyone at HBC between the date her original FMLA approval ended, February 29, 2008, and her termination on April 7, 2008.

**D.     Twigg's Termination**

On April 1, 2008, Sade sent an e-mail to Cotton expressing her expectation that Twigg would return to work the following day: "I have not heard that Denice's [short-term disability] is approved past today so I assume she will be at work tomorrow. If anyone knows anything different please let me know." (Aplt. App. at 151.) The next day, Cotton responded by informing Sade that, according to MetLife, Twigg had not applied for an extension of her short-term disability benefits past April 1, 2008.

Twigg did not return to work on April 2, nor did she come in on April 3 or 4. Moreover, Twigg did not call her supervisors to report her absences on those days. Thus, Twigg's absences on April 2, 3, and 4 constituted absences on three consecutive working days without proper notification, in violation of HBC's Rules of Conduct. As noted above, the presumptive discipline for Twigg's violation was termination, but HBC's rules provided management with the discretion to determine whether termination was warranted under the circumstances.

Kathy Sade made the decision to terminate Twigg, with some input from the HR department. On April 7, 2008, Sade sent a termination letter to Twigg via certified mail. The letter informed Twigg that she was terminated as of April 7, 2008, for violating Rule

11

1 of HBC's Rules for Personal Conduct. The post office first attempted to deliver this letter on April 9, 2008, but Twigg did not pick it up until April 17.

During her deposition, Sade was asked why she chose to terminate Twigg for the unreported absences in April when she had discretion not to impose termination as a sanction and when she had previously not taken action for unreported absences in March (i.e., the absences when Twigg's status was "FMLA pending"). Sade explained that HBC was in the process of reviewing Twigg's performance evaluations for the past year and had determined that Twigg was going to be given a low enough rating that she would be placed on a "Performance Improvement Plan" when she returned from leave. The low rating was based on a decline in Twigg's work performance, excessive tardiness, Twigg's failure to log on to the phone system as she was required to do, "and various other things." (Id. at 206.) According to Sade, Twigg's performance issues influenced the decision not to depart from the presumptive discipline of termination. (Id. at 207 ("These [issues] were considered because [Twigg] had a failure to report and I was not going to look the other way because she was going to be placed on a Performance Improvement Plan.").)

## E. The Aftermath and HBC's Decisions Not to Reinstate Twigg

On April 11, 2008, Twigg returned to Dr. Lickteig for another examination. In his chart note for this examination, Dr. Lickteig wrote, in relevant part, "The patient is in today for postop check from her bunionectomy performed six weeks ago. She is doing

12

very well on the right foot. . . . Is set to return to work on 04/21/2008 and I gave her a back to work slip for that time." (Aplt. App. at 219.)

On the morning of April 15, 2008, Twigg wrote an e-mail to Sade and Cindy Ealey. In the e-mail, Twigg said, "I wanted to let you know I will be returning to work on Monday April 21st." (Id. at 221.) Sade forwarded this e-mail to Candye Daughhetee, the head of HBC's HR department. Later that morning, Daughhetee left a voicemail for Twigg at her home phone number and sent Twigg an e-mail asking Twigg to contact her.

In a letter dated April 16, 2008, MetLife notified Twigg that her claim for disability benefits was being closed as of April 1 on account of her failure to provide requested medical information. MetLife also sent Amber Cotton an e-mail notification that Twigg's file had been closed because "no medical information was recieved [sic]." (Aple. Supp. App. at 183.) On that same day, however, Dr. Lickteig faxed his April 11 chart note to MetLife. Consequently, MetLife sent another e-mail to Cotton the next day indicating that it had extended Twigg's short-term disability benefits through April 20, 2008.

As noted above, Twigg picked up her termination letter from the post office on April 17, 2008. Also on April 17, Twigg spoke with both Daughhetee and Sade on the phone. During Twigg's conversation with Sade, Sade explained to Twigg that her FMLA leave "had not been approved past April 1 and she was basically a no-show." (Aplt. App. at 234.) Twigg then expressed her belief that Sade should have been able to get her FMLA leave approved for the full amount of time requested. Sade responded that she

13

had no authority over FMLA matters.  Twigg also complained that no one had told her that her leave had not been approved.  But Sade "corrected her and said Amber Cotton had called her and informed her it was only approved to the 1st of April."[2]  (Id.)  Finally, Twigg asked if Sade "wanted her to come back."  (Id.)  Sade stated that she did not, given Twigg's "performance and attitude for the last couple of years, especially the last year."  (Id.)

At some point after Twigg's termination, Sade learned of MetLife's decision to extend Twigg's short-term disability benefits through April 20, 2008.[3]  In her deposition, Sade testified that MetLife's decision did not cause her to contemplate retracting Twigg's termination.  Sade explained, "[A]s I said earlier, [Twigg] was going to be put on a Performance Improvement Plan when she got back -- if she got back.  And she still had a failure to report."  (Id. at 207.)

On April 28, 2008, Twigg filed an administrative complaint against HBC with the U.S. Department of Labor ("DOL"), prompting the DOL to begin an investigation.  On October 20, 2008, Nita Long participated in a final conference with a DOL investigator.  During the conference, Long and the investigator discussed the possibility of Long's reinstating Twigg.  Long described the substance of that conversation in her deposition:

---

[2] This statement is unsupported by Cotton or Twigg, as Cotton testified that she had no memory of calling Twigg to tell her that her leave had only been approved through April 1 and Twigg claims that such a call never occurred.

[3] It is not clear from the record whether Sade knew of the MetLife decision as of April 17, when she had her phone conversation with Twigg.

Q. Do you recall having a conference with [the investigator] in which the issue of reinstating Ms. Twigg came up?

A. She did ask me if I would do that, yes.

Q. And what was your answer?

A. My answer was no.

Q. And you were the decision-maker who made the decision not to reinstate Ms. Twigg, correct?

A. Based on the fact that I wasn't going to change my decision on the FMLA.

Q. And what was the reason why you refused to reinstate Ms. Twigg?

A. Well, number one, the employee was already terminated for failure to report. I felt that the decision to terminate her for failure to report was correct. That based on the evidence that we had, she had not done -- had not held up her responsibility by staying in touch with the company. That was her obligation, she didn't do it and so I felt that the termination was proper. I didn't see any reason to go back and make any changes from my perspective.

(Id. at 199.)

## F. Proceedings in the District Court

Twigg filed suit against HBC in the District of Kansas on December 28, 2008, alleging (1) retaliation under 42 U.S.C. § 1981 based on her defense of her black coworker, Teresa Cole; (2) retaliation under the FMLA; (3) and interference under the FMLA.[4] After the final pretrial conference and entry of the pretrial order, HBC moved

---

[4] Twigg also alleged retaliation under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461, but she has abandoned that claim on appeal.

15

for summary judgment on all of Twigg's claims. In an order dated April 21, 2010, the district court concluded that Twigg could not establish a prima facie case of retaliation under § 1981, that Twigg could not establish a prima facie case of retaliation under the FMLA, and that Twigg could not establish any of the elements of an FMLA interference claim. As a result, the district court granted summary judgment in favor of HBC. Twigg timely appealed to this Court.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same legal standard as the district court. Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party. Stover, 382 F.3d at 1070.

## III. DISCUSSION

On appeal, Twigg argues that genuine issues of material fact preclude summary judgment with respect to each of her three claims. We address her claims in turn.

## A. Twigg's § 1981 Retaliation Claim

Twigg first contends that Kathy Sade terminated her in retaliation for her complaints about the treatment of Teresa Cole. This Court has recognized that an employee who believes that she has been retaliated against because of her efforts to

16

vindicate the rights of a minority coworker may bring an action against her employer under 42 U.S.C. § 1981.[5] Skinner v. Total Petrol., Inc., 859 F.2d 1439, 1447 (10th Cir. 1988) (per curiam); see also CBOCS W., Inc. v. Humphries, 553 U.S. 442, 457 (2008) (holding that § 1981 encompasses retaliation claims). Moreover, "the showing required to establish retaliation is identical under § 1981 and Title VII [of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17]." Roberts v. Roadway Express, Inc., 149 F.3d 1098, 1110 (10th Cir. 1998). Therefore, the principles set forth in Title VII retaliation cases apply with equal force in § 1981 retaliation cases.

In this circuit, a plaintiff bringing a retaliation claim "must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224–25 (10th Cir. 2008). Under the direct/"mixed motives" approach, "the plaintiff may directly show that retaliatory animus played a 'motivating part' in the employment decision." Id. at 1225 (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989) (plurality opinion), superseded in part by 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B)); see also id. at 1226.

---

[5] Section 1981 provides, in relevant part, as follows:

(a) Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

17

If the plaintiff can prove that retaliatory animus was a motivating factor, the burden shifts to the employer to demonstrate that it would have taken the same action irrespective of the retaliatory motive. Id. at 1225.

If the plaintiff cannot directly establish that retaliation played a motivating part in the employment decision, she may instead rely on the three-part framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to prove retaliation indirectly. Fye, 516 F.3d at 1225, 1227. Under the McDonnell Douglas/indirect approach, the plaintiff must first make out a prima facie case of retaliation by showing "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Somoza v. Univ. of Denver, 513 F.3d 1206, 1212 (10th Cir. 2008) (internal quotation marks omitted). If the plaintiff establishes a prima facie case, the employer must then offer a legitimate, nonretaliatory reason for its decision. Id. at 1211. Finally, once the employer has satisfied this burden of production, the plaintiff must show that the employer's reason is merely a pretext for retaliation. Id.

Although the direct/"mixed motives" approach and the McDonnell Douglas/indirect approach represent distinct methods of proving retaliation, a plaintiff may allege that her evidence demonstrates retaliation under both frameworks. See Fye, 516 F.3d at 1225–26. "At some point, however, the plaintiff must persuade the factfinder either that the evidence shows retaliation was a 'motivating factor' (in which case the

evidence is analyzed within the mixed-motive framework) or that it shows the employer's reason is unworthy of belief (in which case it is analyzed within the pretext framework)." Id. at 1225.

In opposing HBC's motion for summary judgment, Twigg contended that she was "asserting a mixed motives theory of recovery in regard to her retaliation claim under § 1981." (Aplt. App. at 175.) The district court, however, concluded that Twigg could not rely on the direct/"mixed motives" theory because she did not include it in the pretrial order. Furthermore, the court determined that Twigg's direct/"mixed motives" theory was not viable in any event, as Twigg offered no evidence that directly reflected HBC's retaliatory animus. Accordingly, the court analyzed Twigg's § 1981 claim under the McDonnell Douglas/indirect framework and ultimately held that Twigg could not establish a prima facie case of retaliation.

On appeal, Twigg maintains that she is proceeding only under the direct/"mixed motives" approach and not under the McDonnell Douglas/indirect approach. Twigg does not quarrel with the way in which the district court analyzed the evidence under the McDonnell Douglas/indirect framework; rather, her argument is that the court should not have invoked that framework at all, and that she presented sufficient evidence to survive summary judgment if the evidence is examined within the direct/"mixed motives" framework.[6] Accordingly, we will analyze the evidence using only the direct/"mixed

---

[6] Indeed, nowhere in the discussion of her § 1981 claim does Twigg mention the McDonnell Douglas/indirect framework except to say that it does not apply to her claim.

19

motives" framework and will not review the district court's ruling that Twigg's evidence is deficient if evaluated within the McDonnell Douglas/indirect framework. See LifeWise Master Funding v. Telebank, 374 F.3d 917, 927 n.10 (10th Cir. 2004) (concluding that a party failed to appeal certain district court rulings when "it set forth no substantive arguments against the district court's decisions" in its brief); O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1257 n.1 (10th Cir. 2001) ("We will not make arguments for [a party] that it did not make in its briefs."). Having carefully considered the record and Twigg's arguments on appeal, we agree with the district court that Twigg has offered no evidence that directly establishes HBC's retaliatory intent. This deficiency is fatal to her direct/"mixed motives" theory.[7]

### 1. Twigg's Direct/"Mixed Motives" Theory of Retaliation

"A mixed-motive case is not established . . . until the plaintiff presents evidence that directly shows that retaliation played a motivating part in the employment decision at issue." Fye, 516 F.3d at 1226. Although the plaintiff must prove retaliation "directly" in a direct/"mixed motives" case, the plaintiff is not limited to relying on "'direct' evidence 'in its sense as antonym of "circumstantial."'" Id. (quoting Ostrowski v. Atl. Mut. Ins.

_____

(See Aplt. Br. at 23 ("Where a mixed-motive theory of recovery is asserted, the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) is not applicable.").)

[7] Because we affirm the district court's rejection of Twigg's direct/"mixed motives" theory on this basis, we express no opinion on the correctness of the district court's alternative holding that Twigg's failure to include a direct/"mixed motives" theory in the pretrial order precludes her from asserting such a theory now.

20

Cos., 968 F.2d 171, 181 (2d Cir. 1992)).  Rather, "the plaintiff must demonstrate that the alleged retaliatory motive actually relates to the question of discrimination in the particular employment decision and may do so through the production of either direct or circumstantial evidence."  Id. (alteration and internal quotation marks omitted); see also id. ("A plaintiff can establish retaliation 'directly' . . . through the use of direct or circumstantial evidence.").  When the plaintiff relies on circumstantial evidence "to establish that the employer was motivated by retaliatory animus, that circumstantial evidence must be tied 'directly' to the retaliatory motive."  Id.  Thus, the plaintiff must "present[] evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude."  Thomas v. Denny's, Inc., 111 F.3d 1506, 1512 (10th Cir. 1997) (second alteration in original) (internal quotation marks omitted); see also Fye, 516 F.3d at 1226–27.[8]

_____

[8] Many courts, including the Tenth Circuit, have sometimes conflated direct evidence with the direct method of proof.  But these are different concepts.  The term "direct evidence," properly understood, refers to a narrow category of "evidence, which if believed, proves the existence of a fact in issue without inference or presumption." Hall v. U.S. Dep't of Labor, 476 F.3d 847, 854 (10th Cir. 2007) (internal quotation marks omitted); see also Fye, 516 F.3d at 1226 (explaining that a letter did not constitute "direct evidence of retaliation, as it [was] not retaliatory on its face and would require us to infer retaliatory motive").  As the Second Circuit observed in Ostrowski, that type of evidence is "usually impossible to obtain" in the employment-law context when the fact in issue is the employer's motivation for a particular employment decision.  968 F.2d at 181. Indeed,

> [s]trictly speaking, the only "direct evidence" that a decision was made "because of" an impermissible factor would be an admission by the decisionmaker such as "I fired him because he was too old."  Even a highly-probative statement like "You're fired, old man" still requires the

21

In this case, Twigg relies on four types of circumstantial evidence to prove

retaliation under the direct/"mixed motives" approach: (1) the allegedly false reason

offered by HBC for terminating Twigg's employment, (2) the close temporal proximity

between Twigg's complaints of racial discrimination and her termination, (3) HBC's

allegedly inconsistent explanations for the decision to terminate Twigg, and (4) HBC's

---

> factfinder to draw the inference that the plaintiff's age had a causal relationship to the decision.

Id. (quoting Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1185 (2d Cir. 1992)).

To prove discrimination or retaliation directly under the direct method of proof, a plaintiff does not need this kind of evidence. Rather, a plaintiff needs evidence that directly reflects the forbidden animus, regardless of whether that evidence is direct or circumstantial. Thus, the statement "You're fired, old man" may be used to prove age discrimination directly, even though it constitutes circumstantial evidence with respect to the ultimate question of whether the employer fired the employee because of his age.

In addition, courts sometimes conflate circumstantial evidence with the indirect method of proof. But as the foregoing discussion suggests, these are also separate concepts. "[A]lthough some of our cases seem to suggest otherwise," a plaintiff is not limited to the McDonnell Douglas/indirect method of proof simply because he or she relies on circumstantial, rather than direct, evidence of discrimination or retaliation. Fye, 516 F.3d at 1226. Rather, circumstantial evidence can be used to establish discrimination or retaliation directly if it is directly tied to the employer's unlawful motive.

In short, courts and litigants should be careful not to confuse the character of evidence (direct vs. circumstantial) with the methods of proving discrimination or retaliation (direct vs. indirect). Drawing a distinction between direct and circumstantial evidence is of minimal usefulness in discrimination and retaliation cases, as only in the rarest of situations will an employee have direct evidence of discrimination or retaliation. In those cases, assuming that the employee's evidence is believed, the employee can prove discrimination or retaliation directly. In the vast majority of cases that involve only circumstantial evidence, however, the crucial inquiry is whether the employee's circumstantial evidence proves discrimination or retaliation, either directly or indirectly.

22

alleged deviation from normal company procedures.  We address each kind of evidence in turn.

### a)      Falsity of HBC's Reason for the Termination

Kathy Sade, the manager in Twigg's department who made the ultimate decision to fire Twigg, claims that she terminated Twigg because Twigg failed to report to work or notify HBC of her absences for three consecutive working days, in violation of the company's Rules of Conduct.  Twigg contends that a reasonable jury could find this explanation false for three reasons: (1) before Twigg's surgery on February 20, 2008, Cindy Ealey, Twigg's immediate supervisor, approved Twigg's out-of-office auto reply message for her e-mail account that stated, "I will be out of the office until approximately April 28, 2008";  (2) on March 4, 2008, Amber Cotton, the HR assistant, told Twigg that her FMLA leave was taken care of and that she (Cotton) would call Twigg if any problems arose; and (3) on March 18, 2008, Twigg sent an e-mail to the employees in her department (including her two supervisors) that provided an update on her status and included a closing line stating, "Take care all, I will see you in about a month."  The problem with Twigg's argument is twofold.  First, and most fundamental, Twigg does not explain how the alleged falsity of Sade's justification for terminating Twigg <u>directly</u> reflects Sade's motive to retaliate against Twigg for her complaints about race discrimination.  Falsity evidence is useful in discrimination and retaliation cases because it is one means of establishing <u>pretext</u>.  <u>See</u> <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000).  In other words, "[i]n appropriate circumstances, the

23

trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory [or retaliatory] purpose." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). Thus, evidence of the falsity of an employer's legitimate, nonretaliatory reason for its action may help a plaintiff prove retaliation indirectly, but such evidence does not directly establish that an employer was motivated by retaliatory animus.

Second, Twigg does not attempt to explain how the evidence that she relies on even shows that Sade's reason for terminating her was false. There is no apparent connection between Twigg's three pieces of evidence and the alleged falsity of Sade's reason for terminating Twigg.

### b) Temporal Proximity

Twigg next argues that the temporal proximity between her second complaint about race discrimination, which was made in late 2007 or January 2008, occurred close enough in time to her termination in April 2008 to justify an inference of retaliation. This argument is similarly without merit. Just like the falsity evidence discussed above, temporal-proximity evidence is relevant in retaliation cases because it may help an employee demonstrate pretext. See Annett v. Univ. of Kan., 371 F.3d 1233, 1240 (10th Cir. 2004). But Twigg does not explain, nor are we able to discern, how the temporal proximity between an employee's protected conduct and a challenged employment action could directly reflect the employer's retaliatory state of mind.

Moreover, we have recognized that evidence of temporal proximity has minimal probative value in a retaliation case where intervening events between the employee's protected conduct and the challenged employment action provide a legitimate basis for the employer's action. See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1203 (10th Cir. 2006); cf. Maestas v. Segura, 416 F.3d 1182, 1189 (10th Cir. 2005) (observing, in the context of First Amendment retaliation, that "evidence of intervening events tend[s] to undermine any interference of retaliatory motive and weaken the causal link" (citation omitted)). In this case, Twigg's unreported absences occurred after her complaint about discrimination and before HBC terminated her employment. Thus, her unreported absences constitute intervening events that undermine her temporal-proximity argument.

### c) Inconsistencies in HBC's Explanations for Twigg's Termination

Next, Twigg contends that Kathy Sade offered inconsistent explanations for Twigg's termination. Specifically, Twigg claims that in the termination letter, Sade asserted Twigg's violation of HBC's notice-of-absence policy as the reason for the termination; however, in her deposition, Sade cited Twigg's performance issues as the justification. Assuming, arguendo, that Sade offered inconsistent rationales for the termination,[9] Twigg has once again failed to explain how this evidence directly shows

---

[9] We are not convinced that Sade gave inconsistent reasons for terminating Twigg. A close reading of Sade's deposition testimony suggests that Sade did not rely on Twigg's performance problems as an independent or alternative basis for Twigg's termination. Rather, Sade took Twigg's performance issues into account when

25

retaliatory motive. Inconsistency evidence, like Twigg's first two forms of evidence, has traditionally been associated with proving pretext. See Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1310, 1311, 1312 (10th Cir. 2005) (per curiam). In other words, an employee relies on an employer's change in explanation to show that the employer is "attempt[ing] to mask an illegitimate motive." Id. at 1312. Thus, evidence of inconsistent explanations reflects an employer's retaliatory animus, if at all, only indirectly.

Furthermore, we have recognized that inconsistency evidence is only helpful to a plaintiff if "the employer has changed its explanation under circumstances that suggest dishonesty or bad faith." Id. at 1310. Twigg does not contend that such circumstances exist here.

### d) Deviations from Normal Company Procedure

Finally, Twigg argues that HBC deviated from its customary practice of approving FMLA leave for the same time period that MetLife approves short-term disability benefits when Sade refused to retract Twigg's termination after learning that MetLife had approved Twigg's short-term disability benefits through April 20, 2008. This argument

---

evaluating whether to impose the presumptive sanction of termination for Twigg's violation of HBC's notice-of-absence policy. In other words, Sade used Twigg's poor performance as a basis for declining to exercise her discretion to impose a lesser sanction than termination. That is not inconsistent with the explanation that Twigg was terminated for failure to notify HBC of her absences for three consecutive days. In any event, at most, the performance issues constitute a supplemental reason for Twigg's termination. Nothing in this Court's jurisprudence prohibits an employer from relying on more than one nonretaliatory reason for terminating an employee.

26

misses the mark for a number of reasons. First, as with the previous three kinds of evidence, Twigg fails to explain how this alleged deviation from HBC's normal procedure <u>directly</u> reflects HBC's motive to retaliate against her for complaining about race discrimination. Although "[t]his court recognizes that disturbing procedural irregularities, including deviations from normal company procedure, provide support for a plaintiff's assertion of <u>pretext</u>," <u>Doebele v. Sprint/United Mgmt. Co.</u>, 342 F.3d 1117, 1138 n.11 (10th Cir. 2003) (emphasis added) (internal quotation marks omitted), such irregularities do not directly demonstrate an employer's retaliatory motive. Deviation evidence can do no more than "permit[] a reasonable inference that [the employer] acted with an ulterior motive and . . . engineered and manufactured the reasons [it] proffered for terminating [the employee's] employment," <u>Doebele</u>, 342 F.3d at 1138, thereby suggesting retaliation only <u>indirectly</u>.

Moreover, the record does not support Twigg's claim that HBC deviated from normal company procedure. Although it is undisputed that HBC has a practice of approving FMLA leave for the same time period that MetLife approves short-term disability benefits, MetLife extended Twigg's short-term disability <u>after</u> HBC had already terminated Twigg. Nothing in the record suggests that HBC has a policy of retracting terminations and retroactively approving FMLA leave for employees who were terminated before MetLife approved short-term disability benefits. Further, Twigg has not alleged, much less offered evidence, that HBC ever treated a similarly situated

27

employee differently than it treated Twigg in this matter. Accordingly, Twigg's deviation argument is meritless.

### 2. § 1981 Retaliation Conclusion

In sum, we conclude that none of Twigg's evidence <u>directly</u> reflects HBC's alleged retaliatory animus. Rather, Twigg's evidence is <u>pretext</u> evidence. Although that kind of evidence might allow a plaintiff to prove retaliation <u>indirectly</u> under the <u>McDonnell Douglas</u> framework, a plaintiff must present more than mere pretext evidence to carry her burden under the direct/"mixed motives" framework. <u>See</u> <u>Van Antwerp v. City of Peoria</u>, 627 F.3d 295, 298 (7th Cir. 2010) ("[A]ssuming [the plaintiff] marshaled enough circumstantial evidence to show pretext, his claim of discrimination under the direct method would still fail. Evidence offered under the direct method must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus." (internal quotation marks omitted)); <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 60 (2d Cir. 1997) ("The types of indirect evidence that suffice in a pretext case to make out a [<u>McDonnell Douglas</u>] prima facie case—or even to carry the ultimate burden of persuasion—do not suffice, even if credited, to warrant a ['mixed motives'] burden shift." (internal quotation marks omitted)).

The few cases in which we have held that a plaintiff presented sufficient evidence to satisfy the burden of directly showing retaliatory motive confirm the soundness of our conclusion. <u>See</u> <u>Medlock v. Ortho Biotech, Inc.</u>, 164 F.3d 545, 550 (10th Cir. 1999) (holding that the plaintiff's evidence directly reflected the employer's retaliatory motive

28

where the plaintiff offered a suspension letter and a termination letter in which the employer explicitly referenced the plaintiff's complaints about discriminatory pay as reasons for taking adverse actions against the employee); Thomas, 111 F.3d at 1512 (holding that the plaintiff was entitled to a "mixed motives" jury instruction where the plaintiff presented evidence "that several people in the promotion decision process had stated that [the plaintiff] would not be considered for promotion because of his discrimination complaint"); Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1471 & n.5 (10th Cir. 1992) (holding that the plaintiff presented sufficient evidence to support a finding of retaliation under the direct/"mixed motives" theory where there was testimony that a supervisor, among other things, held the plaintiff's EEOC filing against her). Unlike the evidence relied on by Twigg, the plaintiff's evidence in each of those cases went directly to the employer's unlawful animus.

Because Twigg's evidence does not demonstrate retaliation directly under the direct/"mixed motives" framework and because Twigg has not pursued on appeal any challenge to the district court's ruling that she cannot establish a prima facie case of retaliation under the McDonnell Douglas/indirect framework, we affirm the district court's grant of summary judgment in favor of HBC on Twigg's § 1981 retaliation claim.

## B.    Twigg's FMLA Retaliation Claim

Twigg's second claim is that HBC retaliated against her for exercising her rights under the FMLA. Twigg contends that her termination on April 7, 2008; Kathy Sade's

refusal to retract her termination on April 17, 2008; and Nita Long's refusal to rehire her on October 20, 2008, all occurred because she exercised her right to take FMLA leave.

Under 29 U.S.C. § 2615(a)(2), it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." We have construed this provision of the FMLA as creating a retaliation theory of recovery. Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1170 (10th Cir. 2006) (citing Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 960 (10th Cir. 2002)). Ordinarily, we evaluate the evidence in FMLA retaliation cases under the McDonnell Douglas/indirect framework described above in connection with Twigg's § 1981 retaliation claim. See id. Here again, however, Twigg claims that she "is asserting a mixed-motive theory of recovery in regard to her retaliation claim under the FMLA."[10] (Aplt. Br. at 33.) Thus, Twigg's position is that she can prevail on her claim by showing directly that retaliation played a motivating part HBC's decisions to fire and not to rehire her.

This Court has not issued a published decision addressing whether the direct/"mixed motives" theory applies in FMLA retaliation cases. In light of the recent

---

[10] As with Twigg's § 1981 retaliation claim, the district court found Twigg's evidence of FMLA retaliation insufficient to defeat summary judgment when analyzed under either the direct/"mixed motives" framework or the McDonnell Douglas/indirect framework. Twigg does not appeal the district court's ruling that she failed to demonstrate a prima facie case of FMLA retaliation under the McDonnell Douglas/indirect framework, instead choosing to pursue only the direct/"mixed motives" theory. Accordingly, we consider only whether the district court correctly evaluated Twigg's evidence of FMLA retaliation within the direct/ "mixed motives" framework.

30

decision of the United States Supreme Court in <u>Gross v. FBL Financial Services</u>, 129

S.Ct. 2343, 2349-51 (2009), there is a substantial question whether a mixed motive

analysis would apply in a retaliation claim under the FMLA. However, we need not

decide that issue in this case. Even assuming, without deciding, that a mixed motive

analysis would be used in a FMLA retaliation case, Twigg's FMLA retaliation claim

would fail.

As we explained above in connection with Twigg's § 1981 retaliation claim, a

plaintiff proceeding under the direct/"mixed motives" approach must present direct or

circumstantial evidence that directly shows that retaliation played a motivating part in the

employment decision at issue. <u>Fye</u>, 516 F.3d at 1226. In the FMLA context, the

retaliatory animus must relate to the employee's FMLA-protected activities, including,

<u>inter alia</u>, the taking of FMLA leave. Twigg's direct/"mixed motives" FMLA retaliation

claim is, in most respects, identical to her § 1981 claim. She relies on the same four

types of circumstantial evidence, "but with additional factual nuances" that allegedly

show HBC's intent to retaliate against her for her taking FMLA leave. (Aplt. Br. at 34.)

Accordingly, the majority of our analysis from Part III.A applies with equal force here,

and we will not rehash that analysis. Instead, we will consider Twigg's "additional

factual nuances" to determine whether they overcome the previously identified

deficiencies in Twigg's evidence.

First, regarding HBC's allegedly false reasons for terminating Twigg, Twigg

claims that one of Sade's statements to Twigg during their phone conversation on April

31

17, 2008, was inaccurate. During that conversation, Sade told Twigg that Amber Cotton in HR had called Twigg at some point and informed her that her FMLA leave had only been approved through April 1, 2008. Construing the evidence in the light most favorable to Twigg, a reasonable jury could conclude that Sade's statement regarding Amber Cotton's phone call was false. See supra note 2. But Twigg makes no argument regarding how the alleged falsity of Sade's statement directly shows that Sade made the decision to terminate Twigg because Twigg took FMLA leave. Nor would such an argument have merit, because, as we explained above, evidence of the falsity of an employer's explanation can prove retaliation only indirectly. Thus, this additional falsity evidence suffers from the same fundamental flaw as Twigg's other falsity evidence when examined under the direct/"mixed motives" framework. See supra Part III.A.1.a.

Second, Twigg relies on the portion of Nita Long's deposition where Long, the HBC benefits director, testified that she refused to rehire Twigg in October 2008 "[b]ased on the fact that [Long] wasn't going to change [her] decision on the FMLA." According to Twigg, because HBC has a practice of approving FMLA leave for as long as MetLife approves short-term disability benefits, and because Long was aware of MetLife's decision to extend Twigg's short-term disability when Long refused to reinstate Twigg in October 2008, "[a] reasonable jury could find Ms. Long's explanations to be inconsistent or contradictory." (Aplt. Br. at 35.) Although Twigg frames this as an inconsistent-explanations argument, she offers no other explanation with which Long's deposition testimony supposedly conflicts. Instead, Twigg's real argument is that Long's

32

explanation cannot be squared with HBC's general practice of basing FMLA leave approval on MetLife's short-term disability determinations, which is more properly viewed as a deviation-from-normal-company-procedure argument. But, as we have already explained, evidence of deviations from normal company procedure can help a plaintiff prove retaliation only indirectly, as such evidence does no more than allow an inference that the employer may be manufacturing rationales to hide the real reason for its actions. Therefore, Long's alleged deviation from HBC's normal practice does not directly reflect retaliatory animus, and this "factual nuance" does not support Twigg's direct/"mixed motives" theory. See supra Part III.A.1.d.

Twigg's final "factual nuance" relates to her temporal-proximity argument. Twigg attributes great significance to the fact that Long refused to rehire her during the course of the DOL's investigation of her administrative complaint. According to Twigg, a reasonable jury could infer retaliatory motive from the close temporal proximity between Twigg's pursuit of her administrative complaint and Long's decision not to reinstate her. The problem with Twigg's argument is that even very close temporal proximity cannot directly show an employer's retaliatory motive. Rather, evidence of temporal proximity may assist a plaintiff in proving retaliation only indirectly, as the function of such evidence is to cast doubt on the sincerity of the employer's legitimate explanation for its actions. See supra Part III.A.1.b.

In short, the "additional factual nuances" associated with Twigg's FMLA retaliation claim do not distinguish this claim from Twigg's § 1981 retaliation claim for

33

purposes of a direct/"mixed motives" analysis. The FMLA claim, like the § 1981 claim, rests entirely on <u>pretext</u> evidence. Such evidence does not suffice to demonstrate retaliatory animus <u>directly</u>. Accordingly, the district court properly granted summary judgment in favor of HBC on Twigg's FMLA retaliation claim.

**C.    Twigg's FMLA Interference Claim**

Twigg's final claim is that HBC unlawfully interfered with her FMLA rights by terminating her employment while she was on FMLA-protected leave.

The FMLA allows a qualified employee to take up to twelve weeks of leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Under 29 U.S.C. § 2615(a)(1), it is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" this substantive right. We have recognized that this provision of the FMLA gives rise to an interference or entitlement theory of recovery. <u>Metzler</u>, 464 F.3d at 1170 (citing <u>Smith</u>, 298 F.3d at 960). In order to prevail on an FMLA interference claim, the employee must show that she was entitled to FMLA leave and that some action by the employer, such as termination, interfered with her right to take that leave. <u>See</u> <u>Bones v. Honeywell Int'l, Inc.</u>, 366 F.3d 869, 877 (10th Cir. 2004); <u>Smith</u>, 298 F.3d at 960.

"Section 2615(a)(1) is nevertheless not a strict liability statute," and an employer is not necessarily liable under the FMLA anytime it fires an employee who has requested or is on FMLA leave. <u>Metzler</u>, 464 F.3d at 1180. Rather, because "an employee who

34

requests leave or is on leave has no greater rights than an employee who remains at work[,] . . . an employee may be dismissed, preventing her from exercising her statutory right to FMLA leave[,] . . . if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." Smith, 298 F.3d at 960–61 (internal quotation marks omitted); see also Bones, 366 F.3d at 877 ("If dismissal would have occurred regardless of the request for an FMLA leave, . . . an employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave."); Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1262 (10th Cir. 1998) ("[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request."). "The burden to demonstrate that 'an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave' is on the defendant-employer." Metzler, 464 F.3d at 1180 (quoting Smith, 298 F.3d at 963); see also Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1289 (10th Cir. 2007) ("Once a plaintiff has proved that her employer has interfered with her right to take FMLA leave, the employer bears 'the burden of proving that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave.'" (quoting Smith, 298 F.3d at 963)).

In this case, the district court determined that Twigg's FMLA interference claim failed at each step in the analysis. Specifically, the court concluded that (1) Twigg could

35

not establish her entitlement to FMLA leave because Dr. Lickteig's certification did not

support the existence of a "serious health condition"; (2) there was no evidence that HBC

interfered with Twigg's right to take FMLA leave because the company approved six

weeks of leave despite Dr. Lickteig's opinion that Twigg could perform non-weight-

bearing work; and (3) HBC demonstrated that it terminated Twigg because of her

violation of the company's notice-of-absence policy rather than her taking of FMLA

leave.

On appeal, Twigg claims that one fundamental error tainted the district court's

analysis.  She argues that Dr. Lickteig's certification, which Twigg submitted in support

of her request to take FMLA leave from February 28, 2008, through April 17, 2008, was

"incomplete" because Dr. Lickteig did not specify the amount of time that Twigg would

need to be off work and did not answer the question whether Twigg was unable to

perform any of the essential functions of her job.  According to Twigg, the "incomplete"

certification triggered HBC's obligations under 29 C.F.R. § 825.305(d) (2008), which

states that "[t]he employer shall advise an employee whenever the employer finds a

certification incomplete, and provide the employee a reasonable opportunity to cure any

such deficiency." [11]  See also Sorrell v. Rinker Materials Corp., 395 F.3d 332, 337 (6th

---

[11] In 2009, the DOL amended the regulation concerning incomplete certifications
and recodified it in a different subsection of 29 C.F.R. § 825.305.  See 29 C.F.R.
§ 825.305(c) (effective Jan. 16, 2009).  The changes are not relevant to any of the issues
in this case, and our discussion focuses on the regulation in effect when HBC made its
FMLA decisions in 2008.

Cir. 2005) (emphasizing that 29 C.F.R. § 825.305(d) "imposes an affirmative duty on an employer that finds a medical certification incomplete"). Because HBC failed to notify Twigg that Dr. Lickteig's certification was "incomplete" and to give her an opportunity to cure the problem, Twigg contends that HBC is now estopped from contesting her entitlement to FMLA leave through April 17, 2008. She further argues that if HBC is precluded from contesting entitlement, "[t]his, in turn, will mean that Ms. Twigg was terminated for exercising her rights under the FMLA, since she was terminated for absences which were in fact protected by the FMLA." (Aplt. R. Br. at 18.)

By contrast, HBC argues that Dr. Lickteig's certification was not "incomplete," but instead unsupportive of Twigg's request for leave. HBC also contends that an employer's failure to comply with § 825.305(d) does not preclude the employer from later challenging the employee's entitlement to leave. Finally, HBC asserts that Twigg's interference claim fails in any event, as HBC terminated Twigg for her violation of the company's notice-of-absence policy and not for her taking FMLA leave.

We need not decide whether a reasonable jury could find that Dr. Lickteig's certification was "incomplete" or whether an employer who violates 29 C.F.R. § 825.305(d) is estopped from contesting the issue of entitlement.[12] Even if we were to

_____

[12] One district-court case from California supports Twigg's estoppel theory. See Sims v. Alameda-Contra Costa Transit Dist., 2 F. Supp. 2d 1253, 1268 (N.D. Cal. 1998) (concluding that because the employer failed to notify the employee that the certification he presented was inadequate and failed to give the employee an opportunity to cure the defect, the employer could not "dispute that [the employee] had a serious health condition throughout the duration of his absence"). The Seventh Circuit, however, has rejected this

agree with Twigg's position on both of these issues, her FMLA interference claim would fail as a matter of law because HBC has carried its burden of proving that Twigg was dismissed for a reason sufficiently unrelated to her FMLA leave. Our decision in <u>Bones v. Honeywell International, Inc.</u> compels this result.

In <u>Bones</u>, the plaintiff missed work to visit a doctor on Thursday, July 22, 1999, and did not call in her absence. 366 F.3d at 874. Likewise, she missed work on Friday, July 23, and Monday, July 26, without notifying anybody at Honeywell of her absences. <u>Id.</u> On Friday, July 23, however, Bones's boyfriend delivered an FMLA leave request to Honeywell's medical department. <u>Id.</u> The request contained a certification from Bones's doctor indicating that Bones was unable to work on all of the days that she missed, as well as several weeks into the future. <u>Id.</u> On Tuesday, July 27, before Honeywell's medical department could process Bones's leave request, Honeywell terminated Bones's employment because she had missed work for three straight days without notifying her supervisor of her absences. <u>Id.</u>

Bones sued Honeywell under the FMLA, arguing that Honeywell interfered with her right to take FMLA leave by firing her while she was on FMLA-protected leave. <u>Id.</u> at 877. In reviewing the district court's grant of summary judgment in favor of

position. <u>See</u> <u>Darst v. Interstate Brands Corp.</u>, 512 F.3d 903, 910 (7th Cir. 2008) (holding that the FMLA does not provide a remedy for an employer's breach of its obligations under 29 C.F.R. § 825.305(d) unless the violation prejudiced the employee by causing the loss of FMLA leave to which he was entitled; explaining that the employer's breach in that case caused the employee no harm because the employee could not show that he could have cured the deficiency in a manner that would have demonstrated that he was actually entitled to FMLA leave).

Honeywell, we <u>assumed that Bones was entitled to FMLA leave</u> on the days that she missed work. <u>Id.</u> Nevertheless, we affirmed the district court. <u>Id.</u> at 878. We explained that "[a] reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory." <u>Id.</u> at 877. We further determined that Honeywell met its burden of demonstrating that Bones would have been dismissed regardless of her request for an FMLA leave by putting forth uncontroverted evidence that it fired Bones for violating the company's absence policy. <u>Id.</u> at 878. In conclusion, we observed that

> Bones was terminated because she did not comply with Honeywell's absence policy; she would have been terminated for doing so irrespective of whether or not these absences were related to a requested medical leave. Bones' request for an FMLA leave does not shelter her from the obligation, which is the same as that of any other Honeywell employee, to comply with Honeywell's employment policies, including its absence policy.

<u>Id.</u> (citation omitted).

<u>Bones</u> thus makes clear that an employer generally does not violate the FMLA if it terminates an employee for failing to comply with a policy requiring notice of absences, <u>even if the absences that the employee failed to report were protected by the FMLA</u>. <u>Accord</u> <u>Bacon v. Hennepin Cnty. Med. Ctr.</u>, 550 F.3d 711, 715 (8th Cir. 2008) ("Employers who enforce [call-in] policies by firing employees on FMLA leave for noncompliance do not violate the FMLA."); <u>Lewis v. Holsum of Fort Wayne, Inc.</u>, 278 F.3d 706, 710 (7th Cir. 2002) (holding that an employer did not violate the FMLA by discharging an employee on FMLA leave when the employee failed to comply with a

39

company call-in policy). This is so because even if the FMLA entitles an employee to be absent from work, the employee's violation of a notice-of-absence policy can constitute "[a] reason for dismissal that is unrelated to a request for an FMLA leave."[13] Bones, 366 F.3d at 877. Formal notice-of-absence policies serve an employer's legitimate business interests in keeping apprised of the status of its employees and ensuring that it has an adequate workforce to carry out its normal operations.

In this case, the record shows that HBC's Rules for Personal Conduct require an employee to report absences to her department and indicate that an employee may be terminated for failure to do so on three consecutive days. HBC's FMLA policy creates a limited exception to the general notice-of-absence requirement, providing that an employee need not report absences once the employee receives formal notification that a request for FMLA leave has been approved. When, however, an employee has requested but not yet received formal approval to take FMLA leave, her obligation is the same as that of any other employee—to give proper notification of her absences.

---

[13] We note that the plaintiff in Bones did not argue that Honeywell's enforcement of its absence policy was unlawful for any reason other than the mere fact that Bones's absences were protected by the FMLA. Accordingly, Bones did not require us to consider situations in which an employer might not be able to rely on an employee's violation of an absence policy as an unrelated reason for dismissing the employee, such as if the employer enforced its absence policy in a discriminatory manner by applying it only to employees on FMLA leave or if the employer engaged in conduct that would estop it from enforcing the policy. Because Twigg challenges HBC's enforcement of its notice-of-absence policy only on the same ground that the plaintiff in Bones challenged Honeywell's enforcement of a similar policy, we likewise do not address these possibilities here.

Here, it is undisputed that Twigg never received formal approval of her FMLA leave past April 1, 2008, and that she failed to report her absences on April 2, 3, and 4. Furthermore, HBC has provided both documents and deposition testimony indicating that it terminated Twigg because she failed to give proper notice of her absences on these days. Twigg has not come forward with any evidence to contradict HBC's explanation for her termination, nor has she raised any arguments that would call into question the legitimacy of HBC's enforcement of its notice-of-absence policy under the circumstances of this case. See supra note 13. Instead, Twigg argues only that she "was terminated for exercising her rights under the FMLA, since she was terminated for absences which were in fact protected by the FMLA." (Aplt. R. Br. at 18 (emphasis added).) But Bones, which Twigg makes no effort to distinguish, vitiates this argument. Accordingly, "[n]o reasonable juror could deduce from the above evidence that [Twigg's] termination was related to her request for an FMLA leave." Bones, 366 F.3d at 878. The district court therefore properly granted summary judgment in favor of HBC on Twigg's FMLA interference claim.

## IV.    CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision granting summary judgment in favor of HBC on all of Twigg's claims.