FILED
United States Court of Appeals
Tenth Circuit

January 29, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

MARCUS RICHARDSON,

     Plaintiff-Appellant,

v.

DENNIS GALLAGHER, in his official
capacity as Auditor, and in his
individual capacity; JOHN
CARLSON, in his official capacity as
Deputy Director of Audit Services,
and in his individual capacity; DAWN
SULLEY, in her official capacity as
Deputy Auditor, and in her individual
capacity; DENVER AUDITOR'S
OFFICE; CITY AND COUNTY OF
DENVER,

     Defendants-Appellees.

No. 12-1410
(D.C. No. 1:10-CV-02097-MSK-CBS)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **TYMKOVICH**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**MURPHY**, Circuit Judge.

_____

     Appellant Marcus Richardson appeals the district court's grant of summary

_____

[*]  This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

judgment in favor of Appellees, including the City and County of Denver (also referred to herein as City); the Denver Auditor's Office (Auditor's Office); Dennis Gallagher in his individual capacity and official capacity as Auditor; John Carlson in his individual capacity and official capacity as Deputy Director of Audit Services; and Dawn Sulley in her individual capacity and official capacity as Deputy Auditor. His complaint against Appellees charges racial discrimination and retaliation in violation of the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981, 1983 and 1988, as amended, 42 U.S.C. §§ 2000e to 2000h-6. The crux of Mr. Richardson's civil rights lawsuit centers on his claims of disparate treatment because of his race as an African American and retaliation following his allegations of race discrimination. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. Factual Background

In its order on summary judgment, the district court relied on the following material undisputed facts and, if disputed, on facts in favor of Mr. Richardson; we add only a few additional undisputed facts helpful to our disposition of this appeal. Mr. Richardson is an African American male who, from 1983 to November 15, 2010, was an employee of the Auditor's Office, eventually holding the title of Internal Audit Supervisor in which he was responsible for performing contract "compliance audits" for the City and managing a team of subordinates

jointly working with him on such audits.[1]  On January 1, 2008, as a result of a voter-approved initiative concerning the Auditor's Office, auditors also began to do "performance audits," assessing whether governmental agencies efficiently and effectively met their objectives.[2]  Although Mr. Richardson previously received "exceptional" job performance ratings, his May 2008 performance review, conducted for the first time under the performance audit system, resulted in an overall rating of "successful," which is a rating one step below "exceptional." His evaluation, conducted by his then-direct supervisor, Dick Wibbens, indicated he should attempt to improve in areas relating to accepting responsibility for his own work, providing increased coaching and mentoring of his team, and completing audits in a timely manner.  Notwithstanding these identified problems, in 2008 and 2009 Mr. Richardson's audit team completed more audits and succeeded in identifying more money owed to the City than any other team.

As part of the new voter-approved initiative, certain supervisory changes also occurred in the Auditor's Office; as a result, Kip Memmott received a promotion to Director of Audit Services, and thereafter, in December 2008, hired

---

[1]  A compliance audit is essentially a review of the business application of a contract to ensure the terms and conditions of that contract are satisfied.

[2]  Performance audits include compliance audits but also are more complex and focus on effective use of tax dollars and other revenues as well as evaluate the effectiveness of city governance and related processes.  This type of audit requires a different, higher skill set than the more traditional compliance audits previously performed.

John Carlson as Deputy Director of Audit Services. In Mr. Carlson's opinion, the Auditor's Office needed to improve its performance in various respects, including issues relating to quality control, writing skills, and timely issuance of audit reports.[3]

In May 2009, Mr. Carlson, now Mr. Richardson's supervisor, evaluated him for the first time, giving him another "successful" rating and inviting him to improve his performance in various aspects, including improving his supervisory and written communication skills as well as completing audits in a more timely manner. Mr. Richardson responded with a memorandum he gave to Mr. Carlson, Mr. Memmott, and others in which he disagreed with Mr. Carlson's conclusions and offered explanations for the identified performance problems. His response centered on problems with another team member whose work he had to rewrite and his assertion that other auditors also performed poorly. He also stated:

> As a Black male supervising and working with a diverse group of colleagues, it can be somewhat difficult because employees come from different backgrounds and cultures and in many cases do not always understand or want to understand persons different from themselves. In this rating period, I believe my supervisor has placed a higher standard on me because of this lack of understanding.

He also suggested "some level of understanding is needed by all persons affected here through developing an understanding of the cultures of someone different

---

[3] Similarly, Mr. Memmott, in his new position, also identified improving writing skills and timely issuance of audit reports as some of the goals under the new regime and believed past performance evaluations were highly inflated and not reflective of the work produced.

than themselves," recommended initiating "some action that will assist us all to increasing the level of understanding, tolerance, and patience with others," and requested an independent evaluation of Mr. Carlson's rating of him.[4]

In his May 2010 evaluation, Mr. Richardson again received a rating of "successful," along with criticisms and suggestions for improvement, including suggestions to improve his written work product and criticism over his missing deadlines and the type of evidence he used to support his audit conclusions. Thereafter, Mr. Richardson and his team did not complete several audits in a timely manner, including two audits started in December 2009 and planned for completion on May 20, 2010, which were not completed in May, and extended deadlines of June 17, July 15, and August 19, 2010, were also missed.

In August 2010, Mr. Carlson stated his continuing dissatisfaction with certain aspects of Mr. Richardson's performance and placed him on a "performance improvement plan" for the purpose of relieving him of supervisory responsibilities, giving him specific goals and objectives to achieve, and requiring him to meet weekly with Mr. Carlson and another supervisor to discuss his progress and performance. The letter embodying the performance improvement

---

[4] Mr. Memmott put a memo in Mr. Richardson's file responding to his memorandum by discussing his performance defects and problems. While the parties dispute whether the memo was placed in his file in May or September 2010, it is irrelevant given the district court did not rely on it for the purpose of granting summary judgment, and other evidence in the record more than sufficiently outlines Mr. Richardson's performance deficiencies.

plan stated Mr. Richardson failed to meet several fixed deadlines on audits and directed him to achieve improvement in "completing quality performance audits early or on time based on work plans developed by the audit team,"[5] "deliver[ing] projects in a timely manner," giving "timely notification to colleagues," ensuring "co-workers have awareness of when tasks will be completed," improving "written and oral communication regarding audit work," and delivering "timely, clear, accurate, and well-written audit reports based on the five elements of a finding and representing the *best and final* effort of the individual and audit team."

At weekly meetings in August and September 2010, Mr. Richardson's evaluators pointed out his grammatical errors, structural flaws, and other errors in his audits and projects, including his omission of the five elements required for an audit. In addition, Mr. Carlson and another supervisor filed a complaint with Mr. Memmott, noting Mr. Richardson behaved in an "intimidating and threatening" manner, "pointing his finger in [one of their] face[s]," and pacing the room in frustration while complaining of unfair treatment; another person also witnessed this behavior and it is reflected in the minutes of the meeting. This behavior is the reason stated for Mr. Richardson receiving a written reprimand. Mr.

---

[5] Mr. Carlson stated in his declaration that deadlines within an audit project were set by the audit team itself, including Mr. Richardson and his subordinates. In turn, Mr. Richardson generally claimed Mr. Carlson set "inconsistent" or "unreasonable" deadlines that all supervisors missed.

Richardson, who apparently disagreed with their characterization of his behavior and the propriety of the reprimand, eventually filed a grievance regarding the reprimand.

In addition, shortly after receiving the written reprimand, Mr. Richardson commenced the instant discrimination and retaliation action while maintaining his employment with the Auditor's Office.[6] Meanwhile, the parties continued to have weekly meetings with Mr. Richardson in which Mr. Carlson and others continued to assign or remove tasks from him. In instances too numerous to detail here, they also provided constructive criticism of his work performance involving his failure to address questions posed to him, failure to produce an adequate or satisfactory audit which included the requisite five elements, and his grammatical errors and lack of timeliness. Mr. Richardson refused to sign the reports from most of those meetings.

---

[6] In early September 2010, Mr. Memmott wrote to the Human Resources Office, requesting it "perform a 'trend analysis'" of employee ratings, both pre- and post-2008, to rebut Mr. Richardson's contention the office had "inconsistently addressed the performance of [employees] ... in a discriminatory manner" and stating "the trend analysis should clearly demonstrate that the documented performance of several supervisors ... declined and that these performance issues were clearly documented." While the district court noted Mr. Richardson's belief Mr. Memmott's use of the word "should" directed the Human Resources Office to create an analysis meeting his expectations, it stated its belief he used the word in the sense of expectation, believing a fair analysis would likely demonstrate the post-2008 evaluations were proper and nondiscriminatory. In any event, we agree with the district court that this communication does not meaningfully bear on Mr. Richardson's claims nor on the disposition of this appeal.

On October 27, 2010, the Auditor's Office issued a pre-termination letter, notifying Mr. Richardson it was considering terminating his employment as a result of his failure to demonstrate adequate improvement under his performance improvement plan and stating he had been placed on the plan for the purpose of providing "quality performance audits early or on time based on the work plan developed by the audit team," "thoughtful and efficient use of time in the office to deliver projects in a timely manner," "timely notification to colleagues when working in a team environment," as well as "[i]mprovement in written and oral communication regarding audit work." It also provided an exhaustive list summarizing each performance improvement meeting and the defects in Mr. Richardson's performance and failure to make improvements, including problems with grammar, failure to apply the requisite elements for audits, and failure to prepare a changed red-lined version of an audit report. Having determined he failed to meet established standards of performance involving both "qualitative and quantitative" standards and that attempts at improving his performance had been "to no avail," the letter advised a hearing had been scheduled for November 8, 2010, to permit him to make a statement of his position and present evidence contradicting Auditor's Office records. Mr. Richardson submitted a written response, contending, in part, that other than missing deadlines, no significant or specific examples were provided demonstrating that his supervisory and audit skills were inadequate at the time he was placed on the plan, suggesting other

supervisors missed deadlines, and pointing out he produced more audits in 2009 than other supervisors.

On November 15, 2010, the Auditor's Office terminated his employment, citing his failure to meet performance standards and his carelessness in the performance of his duties. The termination letter again provided an exhaustive account of his performance problems documented at each of the weekly meetings and his failure to improve in the areas outlined in each weekly plan, including the fact that one of the large audits and reports he prepared was "one of the poorest 'best and final' drafts" Mr. Memmott had ever seen, the same report lacked any structure or evidence to support the findings listed therein, and he spent many hours on his audit work and related tasks without a deliverable product equal to the amount of time spent. It concluded, based on the tasks assigned and failure to perform those tasks, that Mr. Richardson was not successfully performing work at even two levels below his current supervisory level and was unable to properly perform the work necessary to be an effective Internal Audit Supervisor. This is supported by those evaluating Mr. Richardson's work under the performance improvement plan concluding he did not have the skill set to perform the more complex performance audits at the level of Internal Audit Supervisor or at lower supervisory levels. In a letter issued two days later, the Human Resources Director also responded to Mr. Richardson's formal grievance regarding the earlier written reprimand, stating, in part, that "[w]hile the written reprimand was

one contributing factor, the ultimate decision [to terminate] was made primarily as a result of you not showing an acceptable level of improvement in your performance" under the plan. Mr. Richardson unsuccessfully appealed his grievance.

## II. Procedural Background

Thereafter, Mr. Richardson amended his complaint, which the district court correctly characterized as presenting three claims, including allegations the individual Appellees: (1) violated 42 U.S.C. § 1983, including his constitutional guarantee of equal protection, by engaging in racial discrimination against him; (2) violated 42 U.S.C. § 1981 based on the same racial discrimination and retaliation; and (3) committed negligent hiring under § 1983 giving rise to municipal liability for the individual defendants' constitutional violations. Thereafter, Appellees filed their answer and a motion for summary judgment which the district court granted. In its opinion and order granting the motion, the district court thoroughly addressed the issues raised by the parties and determined, after considering the parties' shifting burdens, that Mr. Richardson failed to show either discrimination based on race or retaliation following his complaints of race discrimination.

To begin, the district court found that even if Mr. Richardson carried his burden of showing his adverse employment actions gave rise to an inference of race discrimination, Appellees met their burden of articulating a legitimate,

nondiscriminatory reason for his placement on the plan and eventual termination based on their belief his work performance was insufficiently satisfactory and did not improve over time while he was on the performance improvement plan. It then explained the burden shifted to Mr. Richardson to show this proffered reason constituted pretext for discrimination, and he failed to meet his burden given Appellees' criticisms against Mr. Richardson were not entirely subjective in nature but, rather, as the performance improvement plan letter pointed out, included objectively-ascertainable tasks, including his failure to meet several fixed deadlines on certain audits after providing directions for him to complete or deliver his audits on time and ensure co-worker awareness of tasks for completion. It also pointed out the pre-termination letter similarly discussed several objectively-ascertainable defects in his performance, including his failure to submit a red-lined version of a modified report, his grammatical errors, and the fact members of his team complained to management about his rewriting of reports without their input.[7] It concluded that even though some of the criticisms entailed subjective criteria, other documented criticisms also showed objective assessment of errors and omissions.

As to Mr. Richardson's evidence allegedly showing Appellees' proffered reasons were pretext for discrimination because similarly-situated white co-

_____

[7] As previously noted, the same or similar problems with Mr. Richardson's performance were outlined in the termination letter.

-11-

workers received more favorable treatment, the district court found, as supported by the record, that those individuals were not similarly-situated. It made this determination because two of them left employment shortly after Mr. Carlson's appointment as a supervisor or were not treated materially differently than him given the similarly-situated white female he identified was also placed on a performance improvement plan and eventually chose to voluntarily demote. Without the ability to demonstrate that similarly-situated white employees were treated more favorably, the district court concluded Mr. Richardson's long service in the Auditor's Office did not protect him from the arrival of a new supervisor with a more critical eye or changes in policies and expectations that arrived with new direction and management.

With respect to his retaliation claims, the district court also employed the requisite shifting of burdens for retaliation claims and determined Mr. Richardson carried his burden of showing his termination was temporally connected to his complaint of discrimination to management and his filing of his discrimination action. However, because the adverse actions supporting his retaliation claims were essentially the same as those underlying his unsuccessful race discrimination claim, the district court found he failed to produce sufficient evidence to demonstrate the falsity of Appellees' articulated, legitimate, non-retaliatory reasons for his placement on the performance improvement plan or termination or that they were pretext for either discrimination or retaliation. Because Mr.

Richardson failed to demonstrate triable claims against any of the individual Appellees, it further concluded it did not need to address his contentions the City and County of Denver shared municipal liability for unlawful actions committed by those individuals. It then granted Appellees' summary judgment motion and this appeal ensued.

## III. Discussion

On appeal, Mr. Richardson raises the same contentions comprehensively addressed and rejected by the district court in its summary judgment decision, including his claim Appellees discriminated and retaliated against him based on his race and that their proffered reasons for his termination constituted pretext for such discrimination and retaliation. He suggests he satisfactorily performed his job as Internal Audit Supervisor, including the fact his team successfully completed more performance audits in 2009 than other teams and successfully completed two performance audits in 2010. He also complains that Mr. Carlson unfairly changed the criteria for his performance improvement plan six times. He also alleges that by being demoted and terminated, he was treated differently and less favorably than a white female Internal Audit Supervisor the district court determined was treated similarly to him and "all other Internal Audit Supervisors," who he generally states also submitted draft reports needing improvement. In support of his retaliation claim, Mr. Richardson relies on Mr. Carlson's admission he used subjective criteria to evaluate his job performance

when he was placed on the performance improvement plan. Mr. Richardson also claims in a cursory statement that Ms. Sulley failed to notify him of his appeal and mediation rights when issuing the reprimand, which he claims constitutes pretext for discrimination, and further claims she launched a biased investigation of him after he filed his lawsuit, which failed to produce any material "dirt." In support of his contentions, he summarily contends the district court erred in (1) overlooking or weighing evidence, or improperly considering inadmissible evidence; and (2) assessing the credibility of witnesses, which he points out is the province of a jury. Apparently, as part of his contention regarding such evidence, he claims the Appellees' affidavits should not be considered because none state "they are made on 'personal knowledge'" or are notarized and dated; the signatures for Mr. Memmott and Ms. Sulley appear over the typed name of Mr. Gallagher; and Appellees' attorney behaved inappropriately in "mentioning [Mr.] Richardson's resignation" and trying to dissuade a witness favorable to him from assisting Mr. Richardson.

A. Standard of Review and Discrimination Law

We review de novo the district court's summary judgment decision and "consider the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences from the available underlying facts." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005) (en banc) (per curiam) (internal quotation marks omitted). Summary judgment is appropriate if

-14-

the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See id;* Fed. R. Civ. P. 56(a). In considering a summary judgment motion, courts "must not judge witness credibility or weigh evidence." *Daniels v. United Parcel Serv.*, *Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).

To prevail on a disparate treatment claim under Title VII of the Civil Rights Act, an employee must show the employer intentionally discriminated against him for a reason prohibited by the Act. *Jaramillo,* 427 F.3d at 1306. An employee may prove a violation by either direct evidence of discrimination or through circumstantial evidence where we apply the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). Under *McDonnell Douglas*, the employee must establish a prima facie case of discrimination by showing: (1) he is a member of a protected class; (2) who suffered an adverse employment action; and (3) such adverse action occurred in circumstances giving rise to an inference of discrimination. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). We have said the burden at this stage is "not onerous." *Id.* If the employee establishes such a prima facie case, then "a presumption of discrimination arises," resulting in the burden shifting to the employer "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Jaramillo,* 427 F.3d at 1307. "If the [employer] carries its burden of

production, the presumption of discrimination drops out of the case," and "[t]he burden then shifts back to the [employee], who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination." *Id.*

Where an employer advances a number of reasons for an adverse employment action, we have adopted a "general rule" that "an employee must proffer evidence [showing] each of the employer's justifications is pretextual." *Lobato v. New Mexico Env't Dept.,* 733 F.3d 1283, 1289 (10th Cir. 2013) (internal quotation marks omitted). An employee, like Mr. Richardson, can demonstrate pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (internal quotation marks omitted). We have said "[e]vidence of pretext may include prior treatment of [the employee]; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating ... criteria); and the use of subjective criteria." *Jaramillo,* 427 F.3d at 1308. Evidence that similarly-situated employees received different treatment is also indicative of pretext and pertains to "those who deal with the same supervisor and are subject to the same standards governing performance

-16-

evaluation and discipline." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007) (internal quotation marks omitted).

Recognizing subjective criteria can indicate pretext, we "view with skepticism the use of subjective evaluations in making termination decisions." *Plotke v. White*, 405 F.3d 1092, 1106 (10th Cir. 2005). However, the existence of subjective criteria alone is not considered evidence of pretext.[8] *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1195 (10th Cir. 2006). We realize the use of subjective considerations by employers "must play some role" in certain management decisions, and therefore, subjective considerations or factors are reviewed on a case-by-case basis. *See Green v. New Mexico*, 420 F.3d 1189, 1195 (10th Cir. 2005). In addition, we proceed with caution in considering the relative merits of individual employees, given this court may not "act as a super personnel department that second guesses employers' business judgments." *Conroy v. Vilsack,* 707 F.3d 1163, 1177 (10th Cir. 2013) (internal quotation marks omitted). In making a pretext determination, a court looks at the facts as they appeared to the person making the employment decision because it is the employer's "'perception of the employee's performance that is relevant, not [the employee's] subjective evaluation of his own relative performance.'" *Kelley v.*

---

[8] We distinguish between employment decisions based on objective criteria, which are generally immune to employer manipulation, and those based on subjective criteria, "which are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination." *Ellis v. United Airlines, Inc.*, 73 F.3d 999, 1004-05 & nn.6, 8 (10th Cir. 1996).

-17-

*Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1177-78 (10th Cir. 2000) (quoting *Furr v. Seagate Tech, Inc.*, 82 F.3d 980, 988 (10th Cir. 1996)). While Title VII, including §§ 1981 and 1983, prohibits race discrimination in employment, it does not protect employees against management decisions that are unwise, illogical, seemingly arbitrary, or seemingly unfair. *See Adamson v. Multi Cmty. Diversified Serv., Inc.*, 514 F.3d 1136, 1153 (10th Cir. 2008.) The "relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Lobato,* 733 F.3d at 1289 (internal quotation marks omitted).

## B.  Discrimination Claim

Having considered the applicable standards of review, burdens of proof and production, and legal principles, we turn to the district court's well-reasoned decision. In ruling in favor of Appellees, the district court proceeded to the proper *McDonnell Douglas* analysis. In so doing, it noted Mr. Richardson, as an African American, was a member of a protected class and assumed, for the purpose of resolving the summary judgment motion, that his treatment in being placed on the performance improvement plan and his termination were adverse actions demonstrating a prima facie case of discrimination. On considering the shifting burden of proof, it determined Appellees provided legitimate, non-discriminatory reasons for his placement on that plan and his eventual termination. We agree. Not only did the employee evaluations point out

-18-

tardiness in completion of Mr. Richardson's audits, but, as the district court pointed out, the document outlining his performance improvement plan leveled similar criticisms regarding his failure to meet several fixed deadlines on audits and provided directions for him to complete or deliver his audits on time and ensure co-worker awareness of tasks for completion. While Mr. Richardson, on appeal, points to the fact he completed numerous other audits and in the past performed in an exemplary manner, we look at the facts as they appeared to the person making the employment decision at the time at issue and his or her perception, not the employee's subjective evaluation of his own relative performance. Not only does the record disclose that Mr. Richardson did not perform timely audits but he does not contest the fact that he did not complete certain audits or complete them in a timely manner, including the two large audits originally due in May 2010 which were not completed until after multiple deadline extensions. As the district court pointed out, the new regime made it a goal or priority to improve audit performance in various respects, including the timely issuance of audit reports as well as improvement of quality control and writing skills.

Even if the deadlines were subjective, timeliness was only one performance problem of many. As revealed by the weekly meeting minutes outlined in the pre-termination and termination letters, Mr. Richardson's performance problems also stemmed from his failure to submit work with the required red-lined

corrections, his submission of audits omitting the required audit elements and containing grammatical errors, and complaints from his team about his performance in rewriting audit reports without team input. As the district court indicated, these problems point to clear, objectively-ascertainable defects in his performance. Indeed, a review of the record in its entirety reveals multiple problems with Mr. Richardson's audits, his failure to address or adequately explain the reasons for these problems, and his supervisors' and evaluators' belief he could not perform the tasks required, not only at the level of Internal Audit Supervisor, but at lower supervisory levels.[9] For these reasons, we agree Appellees carried their burden of articulating legitimate, facially nondiscriminatory reasons for placing Mr. Richardson on a performance improvement plan and terminating him for failure to improve his performance in these respects.

Having determined Appellees met their requisite burden, we turn to Mr. Richardson's argument regarding pretextual discrimination in which he cursorily claims he was treated differently and less favorably than "all other Internal Audit

---

[9] We note the record on appeal contains portions of hearing transcripts from the Career Service Board of Mr. Richardson's appeal of his grievance. While Mr. Richardson relied significantly on these transcripts in his pleadings before they district court, and to a certain extent on appeal, some of them do not identify who is testifying. In addition, only certain pages are replicated, skipping from a few or several lines on one page to a few or several lines many pages later, making it difficult to place the testimony into context or garner the complete testimony on a particular subject.

Supervisors," who he generally states also submitted draft reports needing improvement; and the white female Internal Audit Supervisor, who the district court determined was treated similarly to him. While Mr. Richardson names several individuals to whom we assume he is referring when he uses the blanket reference "all other Internal Audit Supervisors," he does not provide any specifics, including whether they were also supervised by Mr. Carlson or what problems were contained in their draft reports in comparison to his draft reports. One "cannot create a triable issue of fact by making an assertion without supporting facts." *Kelley*, 220 F.3d at 1177. Moreover, the record on appeal only provides annual performance evaluations for three of those individuals for the purpose of comparison. As to two of these individuals, we agree with the district court's determination they were not similarly-situated, given they left their employment with the Auditor's Office only a few months after Mr. Carlson's appointment as supervisor, and Mr. Carlson did not have an opportunity, as he did with Mr. Richardson, to observe a year's worth of their performance or place them on a performance improvement plan. As the district court concluded, this is insufficient to show they were similarly-situated for the purpose of determining whether his placement on a performance improvement plan and termination were racially motivated.

In addition, it is clear Mr. Richardson was not treated differently than the white female to whom he refers, given, as the district court points out, she was

-21-

also placed on a performance improvement plan and eventually chose to voluntarily demote. While she was placed in a less demanding position commensurate with her capabilities,[10] the district court also pointed out Mr. Richardson did not contend, in response to the summary judgment motion, that an open position existed that matched his capabilities or skills or that he applied for such a position. For these same reasons, Mr. Richardson has not shown he was treated differently, and we agree he failed to carry his burden of establishing pretextual discrimination.

As to Mr. Richardson's cursory claim the district court overlooked or improperly weighed evidence, considered inadmissible evidence, and improperly made credibility determinations, we can only assume without further explanation that he is referring to Appellees' affidavits which he now complains are not properly signed, notarized, or dated. In response, Appellees suggest Mr. Richardson should have filed a motion to strike such exhibits, and because he failed to do so, the issue is waived under *Noblett v. Gen. Elec. Credit Corp.*, 400 F.2d 442 (10th Cir. 1968).[11] They also contend the district court did not err or

_____

[10] Even though this white female was not supervised by Mr. Carlson, the district court nevertheless considered Mr. Richardson's argument before discrediting it on other grounds.

[11] As Appellees contend, generally, a party objecting to an affidavit or declaration moves to strike the document. *See Hancock v. Am. Tel. and Tel. Co.*, 701 F.3d 1248, 1262 (10th Cir. 2012), *cert. denied*, 133 S. Ct. 2009 (2013); *Noblett*, 400 F.2d at 445. And where, as here, no objection is made and no gross

(continued...)

abuse its discretion in considering them, given the affidavits were made under penalty of perjury, met the requirements of 28 U.S.C. § 1746, and no local or other court rule prohibits e-signature. In replying to Appellees' contention he waived the issue, Mr. Richardson provides a record reference–albeit in one parenthetical sentence in a record consisting of 674 pages–indicating the affidavit of Mr. Memmott is noncompliant with Rule 56 because it contains only his typed name over the typed name of Dennis Gallagher.

We begin by noting that Mr. Richardson's cursory, parenthetical sentence, pointing out a perceived disparity in only Mr. Mermott's affidavit, does not constitute meaningful notice of an objection requiring a response by the district court under the circumstances of this case. Moreover, even without consideration of Mr. Memmott's declaration, the result would be the same, given the other affidavits and evidence in the record support the district court's summary judgment order. However, even if we consider Mr. Richardson's argument as one raised below and unaddressed by the district court, he cannot prevail with respect to this or the other affidavits.

In the past, Federal Rule of Civil Procedure 56 required papers referred to in an affidavit to be "sworn," which we defined as "a statement reduced to writing and the truth of which is *sworn* to before someone who is authorized to administer

---

[11](...continued)
miscarriage of justice is indicated, an argument regarding technicalities in the form of the affidavit is unpersuasive. *See Noblett*, 400 F.2d at 445.

an oath," thereby indicating a requirement for notarization of a signature. *Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (10th Cir. 2006) (internal quotation marks omitted). The current version of Rule 56 no longer uses the term "sworn" and, instead, states, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matter stated." Fed. R. Civ. P. 56(c)(4). The Advisory Committee note concerning the change explains "[a] formal affidavit is no longer required," and the requirement that a statement reduced to writing be sworn no longer applies. *See* Fed. R. Civ. P. 56, Advisory Comm., 2010 amends., subdiv. (c). Instead, it points out "28 U.S.C. § 1746 allows a written unsworn declaration, ... subscribed in proper form as true under penalty of perjury to substitute for an affidavit." *Id.* Section 1746 also indicates a date and signature are required.

In this case, it is clear that even though the statements of Appellees are titled as "affidavits," they more closely resemble a written declaration under 28 U.S.C. § 1746. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002). Each of the "affidavits" of which Mr. Richardson complains has an affirmation by the declarant of being provided "under penalty of perjury," sets out facts admissible as evidence, and states they are made on personal knowledge. This meets the "under penalty of perjury" and other requirements in 28 U.S.C. § 1746.

As to the absence of a date on the affidavits, we would not ordinarily condone their absence. However, Mr. Richardson not only failed to raise the issue before the district court but has not explained why he could not have raised the issue earlier or how he was prejudiced by the absence of a date. Moreover, as the Sixth Circuit has explained, the absence of a date does not render a declaration invalid if extrinsic evidence demonstrates, as it does here, the period in which the declaration is signed. *See Peters*, 285 F.3d at 476-77. Similarly, we decline to address the issue of the use of e-signatures, given Mr. Richardson's failure to contest the use of such signatures before the district court or adequately address the issue on appeal; Appellees' representation no local rule prohibits e-signatures on non-attorney declarations; and the fact the other evidence in the record, including the weekly minutes from the performance improvement plan meetings, supports the district court's summary judgment decision.[12]

Instead of focusing on the fact electronic signatures were even used, Mr.

_____

[12] Without deciding the issue, we recognize certain federal district courts in other jurisdictions allow, under their local rules, the submission of non-attorney declarations with electronic signatures, requiring, in some instances, counsel to retain the original, signed declaration. *See Brown v. White's Ferry Inc.*, 280 F.R.D. 238, 244 (D. Md. 2012); *Schaub v. Doran*, 2012 WL 4866677, at *1 n.1 (C.D. Ill. Oct. 12, 2012) (unpublished op.); *Manriquez v. Huchins*, 2012 WL 5880431, at *2 (E.D. Cal. Nov. 21, 2012) (unpublished op.); *Deleon v. Hoffman*, 2012 WL 75805, at *6 & n.6 (W.D. N.Y. Jan. 10, 2012) (unpublished op.); *Wildearth Guardians v. U.S. Sec'y of the Int.*, 2011 WL 1225558, at *5 n.2 (D. Idaho Feb. 11, 2011) (unpublished op.); *Sterling Sav. Bank v. JHM Props., LLC*, 717 F. Supp. 2d 1142, 1146 (D. Or. 2010). *But see Fox v. Brown Mem. Home, Inc.*, 2010 WL 4983153, at *1 (S.D. Ohio Dec. 2, 2010) (unpublished op.).

Richardson's appellate brief focuses on the fact Mr. Memmott's and Ms. Sulley's e-signatures appear over the typed name of Mr. Gallagher. However, it is evident the affidavits of Mr. Memmott and Ms. Sulley are indeed their declarations and not those of Mr. Gallagher, who provided his own separate affidavit, despite the fact his name is typed under their signature lines. This is because both affidavits are individually titled "Affidavit of Kip Memmott" and "Affidavit of Dawn Sulley"; identify the affiants as Kip Memmott and Dawn Sulley; begin by recognizing them as the persons making the declarations "under penalty of perjury" and the statements that follow; identify them by their respective positions; end by stating, "I, Kip Memmott [or in her declaration, Dawn Sulley], hereby certify under penalty of perjury that the foregoing affidavit is true to the best of my knowledge, information, and belief"; and contain their names on the signature lines above the typed name of "Dennis Gallagher." We can only presume the typed name of "Dennis Gallagher" is an inadvertent mistake which we deem has no bearing on the substance of the declarations within. Under these circumstances and for all the reasons provided herein, no "gross miscarriage of justice" is indicated by their consideration. *See Noblett*, 400 F.2d at 445. The district court's reliance on these and the other affidavits is reasonable, and we find no evidence in the record that it participated in any inappropriate credibility determinations, nor has Mr. Richardson provided any examples of inappropriate credibility determinations for our review.

Mr. Richardson's cursory allegations on appeal that Appellees' attorney behaved inappropriately in "mentioning [Mr.] Richardson's resignation" and trying to dissuade a witness favorable to him from assisting Mr. Richardson is insufficient without record citation or additional argument and/or evidence for our discussion. As previously noted, Mr. Richardson cannot create a triable issue of fact by simply making a cursory assertion without supporting facts, *Kelley*, 220 F.3d at 1177, and failure to develop an argument on appeal constitutes waiver of such argument*, see United States v. Lamirand*, 669 F.3d 1091, 1098 n.7 (10th Cir. 2012). Similarly, his one-sentence argument in his appellate brief claiming Ms. Sulley failed to notify him of his appeal and mediation rights for the purpose of showing pretext is also not sufficiently developed for our consideration. Moreover, even if we considered this cursory argument on appeal, our review of the record suggests it is unworthy of our reversal on appeal. As the Appellees point out, any mistake in notice of his appeal and grievance rights was corrected when a new reprimand letter issued containing that information after the first one omitted it; Mr. Richardson did in fact file an appeal to a hearing officer; and the reprimand, which was based on his alleged threatening conduct at a weekly meeting, was only one of numerous reasons cited for his termination. As such, no pretext for racial discrimination has been established, and even if it has, Mr. Richardson must provide proof of pretext, not only for this one incident, but for each and every one of the legitimate, nondiscriminatory reasons provided for his

termination and/or placement on the performance improvement plan, which he has failed to do.

We also reject Mr. Richardson's argument pretext exists given his claim Ms. Sulley conducted an improper investigation into his performance after he filed his initial complaint against Appellees. The only evidence we gleaned from the record of such an investigation is contained in Mr. Richardson's own affidavit in which he claims Ms. Sulley "began actively soliciting complaints and other negative information about me from all of my co-workers, which included her asking about whether or not I engaged in threatening conduct toward them." Again, a triable issue of fact is not created by making an assertion without supporting facts. *See Kelley*, 220 F.3d at 1177. Moreover, even if this is true, Mr. Richardson does not provide any evidence or argument on how an investigation into his threatening conduct, or solicitation of complaints by employees concerning threatening conduct against them, constitutes pretext for racial discrimination, especially given his alleged threatening conduct toward others at one of the meetings. Moreover, even if the investigation, if any, was pretextual, he fails to provide evidence of pretext for the rest of the legitimate, nondiscriminatory reasons provided for his termination and/or placement on the performance improvement plan, including grammatical errors and other

deficiencies in his audits and supervision of others.[13]  We are also not convinced

by Mr. Richardson's claim that pretext is shown because the tasks he was to

perform changed six times.  A review of the weekly meetings shows most of the

tasks assigned were related, directly or indirectly, to on-going audit work.

In sum, under the circumstances presented, Mr. Richardson has not

demonstrated pretext "by producing evidence of such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder

could rationally find them unworthy of credence and hence infer that the

employer did not act for the asserted non-discriminatory reasons." *Jaramillo,* 427

F.3d at 1308 (internal quotation marks omitted).  Instead, it is clear from the

entirety of the record that his superiors, who evaluated his performance under the

plan, believed he did not have the skill set to perform in his supervisory position

under the new regime standards, as evidenced by the many instances during the

weekly meetings in which his performance was considered substandard to

expectations for his position.  The relevant inquiry is not whether the proffered

reasons were wise, fair, or correct, but whether Appellees honestly believed the

---

[13]  At oral argument, Mr. Richardson relied on Mr. Carlson's alleged admission that he provided Mr. Richardson with the impossible task of comparing the Sarbanes-Oxley Act of 2002 with local statutes and regulations.  Our review of the transcript purported to be that of Mr. Carlson does not indicate his admission it was an impossible task.  Even if this is true, Mr. Richardson's failure to adequately perform this comparison is not listed as one of the reasons for his placement on the performance improvement plan or for his termination.

proffered reasons and acted in good faith on their beliefs. *See Lobato,* 733 F.3d at 1289. A review of the record establishes they believed he was not capable of performing his job and acted on that belief. For these reasons and the additional reasons provided by the district court in its summary judgment decision, we conclude Mr. Richardson did not carry his burden of showing pretext with regard to his treatment and termination.

## C. Retaliation Claim

"In this circuit, [an employee] bringing a retaliation claim must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (internal quotation marks omitted). "Under the direct/ 'mixed motives' approach, the [employee] may directly show that retaliatory animus played a 'motivating part' in the employment decision," shifting the burden "to the employer to demonstrate that it would have taken the same action irrespective of the retaliatory motive." *Id.* If the employee cannot directly establish that retaliation played a motivating part in the employment decision, he may rely on the three-part framework established in *McDonnell Douglas* to prove retaliation indirectly. *Id.* To establish a prima facie case of retaliation, an employee must show: (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse action a reasonable employee would have found material; and (3) a causal nexus existed between such opposition and the

employer's adverse action. *Id.* If this is established, then the employer must offer a legitimate, non-retaliatory reason for its decision, and once that burden is satisfied, the employee must show the employer's reason is merely a pretext for retaliation. *Id.*

Having considered these principles and for the same reasons previously stated, we agree with the district court that Mr. Richardson failed to carry his burden of demonstrating Appellees' articulated legitimate, non-retaliatory reasons for his placement on the performance improvement plan and termination were false or pretext for retaliation. Because Mr. Richardson failed to demonstrate triable claims against any of the individual Appellees, we also agree the district court did not need to address his contentions the City and County of Denver shared municipal liability for unlawful actions committed by those individuals.

IV.  Conclusion

For the reasons cited herein, as well as the reasons provided in the district court's Opinion and Order Granting Motion for Summary Judgment dated September 24, 2012, we **AFFIRM** its grant of summary judgment in favor of the Appellees.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge